The following cases are scheduled for argument this morning, Tuesday, December 12, 2017. 17-1079, District of Minnesota, The Official Committee of Unsecured Creditors v. The Archdiocese of Saint Paul and Minneapolis, et al. 16-4356, District of Minnesota, Paul Hill v. Accounts Receivable Services And from the District of Nebraska, 16-3013, J. Zola, et al. v. T.D. Ameritrade, et al. 16-3016, Tyler Veradick v. T.D. Ameritrade And 16-3019, Michael Sarvacker v. T.D. Ameritrade, et al. The first case for argument is The Official Committee of Unsecured Creditors v. The Archdiocese of Saint Paul and Minneapolis. Thank you, Mr. Michaels. We'll hear from counsel, Mr. Kugler. Good morning. May it please the court, counsel? There are two legal issues before the court this morning. The first issue is whether the facts pledged by the committee are sufficient to plausibly demonstrate the Giller standard for substantive consolidation. If the court determines that the committee has pledged sufficient facts, the second issue is whether, as a matter of law, the Archdiocese of Saint Paul and Minneapolis, its parishes, and certain related entities are subject to the remedy of substantive consolidation. First, I will address the application of the Giller standard. Giller wisely considered I think you reversed the priorities. I'm sorry? If the cause of action is precluded, it doesn't matter how well it was pleaded. If the court would like me to address... Logically, you've thrown me off. Okay. Well, then, I can easily move to that first. No provision in the Bankruptcy Code specifically affirmatively authorizes substantive consolidation, nor does any provision of the Bankruptcy Code prohibit substantive consolidation. But since at least 1941, as addressed by the Supreme Court in the Samsell decision, substantive consolidation has been recognized as an equitable remedy. That's the only time that the Supreme Court has addressed it? I believe that's correct, Your Honor. And it defined it in a very narrow way. Well... So when your brief says that the federal courts well established by the federal courts that the bankruptcy courts have broad 105A powers to do this. Well... That's not the Supreme Court. Indeed, it's not even the circuit courts. Your sites are all district and bankruptcy courts. Have I got the landscape right? I think so. It's wide open. The way I view it is in 1941, the Supreme Court recognized equitable or substantive consolidation. When there's fraud in an alter ego situation. Yep. And it involved a debtor and a non-debtor in the Samsell decision. And it's been accepted since then. Well, it involved a debtor and it's an alter ego. But the alter ego was not in bankruptcy. It was a non-debtor. Yeah, but you didn't plead alter ego here, did you? No, we pled... You're relying on a broadening of the Supreme Court's definition of this equitable doctrine. I don't think so, Your Honor, with all due respect. What I am seeking to do is to enforce a substantive consolidation that is consistent not only with the Samsell decision, although the facts are not precisely on target, but also consistent with decisions from this circuit and a number of other circuits, including the Ninth Circuit and cases that involve non-debtor consolidations that are relied on or cases relying on non-debtor consolidations out of the Third Circuit in the Owens-Corning case, the Credit Services Corporation in the Sixth Circuit, and the Soviero in the Second Circuit. All right. This equitable remedy has been accepted by most circuits, including the Eighth Circuit in the Giller decision. The foundation of these decisions is that the authority to substantively consolidate arises out of the broad general equitable powers granted to bankruptcy courts. As the Samsell Court said, the Supreme Court said, the power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete. Most frequently, the remedy of substantive consolidation has been utilized to consolidate the estates of related bankrupt entities. That is what was done in Giller and many other cases. But the remedy of substantive consolidation has been recognized in numerous cases. Pardon me? Giller involved all debtors. That's correct. And that's your only Eighth Circuit authority. That is the only Eighth Circuit. The only Eighth Circuit authority regarding non-debtors, much less charitable non-debtors. That's exactly right. There are no cases nationally that I'm aware of that involve religious entities being substantively consolidated. That is a case of first impression for this court. But the remedy of substantive consolidation shouldn't be limited to debtors or non-debtors because the funds. On the remedy question, am I correct that the ultimate remedy you seek is that all the assets of the local parishes within the archdiocese are available for distribution to the archdiocese judgment creditors, regardless of whether that particular diocese ever had a problem with child abuse by its officials or priests? So what I would say is, yes, that is the ultimate remedy we're seeking. And what's your strongest case for the application of that remedy? To a non-debtor that didn't participate in whatever wrongs of the debtor produced the particular creditor's claim. Well, I would say the court to the Bonham decision in the Ninth Circuit and certainly the SAMHSA Supreme Court decision, as well as Owens-Corning, Creditor Service, OVRO. What we're seeking to do, we're the committee. We have an obligation to investigate the assets and liabilities of the debtor. One of the fundamental things that you do in bankruptcy is identify the estate at the outset of a bankruptcy case. This estate has never been properly identified, and that is why we need to go through this exercise of substance consolidation. I would also say that we are, at this point, seeking an evidentiary hearing on it. We were dismissed at a motion-to-dismiss stage. So, yes, ultimately we would get to that remedy. If we can make the case and meet the Giller standards in front of a trial court, that here's the evidence. But short of that, that opportunity will be cut off. Well, it seems to me that one of the problems with your motion is that it's taking this sort of shotgun approach to every single parish and every single entity. And you have put some facts as to some two or three of the entities. But what justification would there be to bring a parish in that say that's been in existence for 100 years, has always observed corporate formalities, all the money has come from the contributions of the parishioners over 100 years? How can you bring an entity like that in, particularly since they've been incorporated in accordance with the laws of the state of Minnesota? So I have a couple of responses to that. First of all, our perspective is we're not bringing anyone in. They're already in. They're already part of this bankruptcy estate. So that means the Minnesota statute means nothing. No, I would say that the Minnesota statute absolutely clarifies and highlights the interrelationship, the domination and control that is exerted by the archdiocese over these parishes. It mandates that they control and dominate. Well, let's assume they control. Let's assume that there's de facto control by the archbishop over all the parishes, and I think that you probably applaud that sufficiently. But don't you need more than control? Don't you need at least some type of commingling of assets or transfer of assets back and forth? Is control alone enough? I would say that, and this really gets back to Giller, because Giller, I believe, you know, Giller was after some of the seminal cases and some of the consolidation, and it wisely chose not to engage in a 12-factor analysis. Giller gave the trial court the flexibility to look at all these cases on a case-by-case basis because all of these are sui generis. None of these cases are going to be the same. So financial intermingling is a factor. But if that doesn't exist, that doesn't mean you're not eligible for substantive consolidation. You have to look at the entirety of the case to make a decision, and that really is the beauty of Giller, is that it allows the court to consider all the factors and make a decision. Well, what do you have in this case beyond control? I mean, is your argument that this case falls or rises on control? No, no. I mean, what do you have beyond control? Okay, I have. I mean, as to a couple, I mean, but again, as to all the parishes. That was the second point I wanted to get to. Certainly the evidence will vary with respect to each entity that we seek to substantively consolidate. In some cases, it will be stronger. In some cases, it will be weaker. But with respect to all of them, we've pled evidence, and we should be entitled to survive the Iqbal Toomble standards on a motion to dismiss. We have stated a plausible claim. What do you have besides control in my hypothetical parish? So there is financial intermingling. There are creditors, overlapping creditor claims between the archdiocese and these parishes. So what? I mean, when a parent corporation goes bankrupt, its subsidiaries may or may not, regardless of common creditors. But when you have 455 claims against the archdiocese, I'm sorry, 445, and 445 claims against the parishes. My hypothetical was a parish that has no claim. And my response to that is I have various levels of evidence with respect to those entities. I'm asking you what. Where do I look? Give me record sites. Well, certainly there's all kinds of intermingling with respect to insurance issues. There's a general insurance fund that all the parties participate in that's required by the archdiocese. What difference does that make? Well, you're asking me what other evidence I have of intermingling, and I would point to the What evidence do you have other than broad allegations of control that the innocent parishioners of my hypothetical parish should lose all the assets that they've contributed to developing for 40 years, let's say, in order to satisfy your clients of legitimate claims against a different entity? Well, I would respectfully say that the proper focus is not on the parishioners of each of the parishes, but is on the claims of the creditors. They'd be the victims in order to reduce the victimhood, if you will, if that's a word, of your clients. We were talking, you're advocating creating a new class of innocent victims to help remedy another class of innocent victims. For torts perpetrated by others. I respectfully disagree that that's what I'm advocating for. What I'm advocating for is that the Catholic Archdiocese of St. Paul, Minneapolis, and all of its assets be used to address the legitimate claims of the survivors, the creditors. Now, what would you hope to develop on discovery if you were granted that? So, I think that we could establish much more along the lines of the financial entanglements and You've been denied that information, or your requests for information have been denied? Absolutely, on multiple occasions. Basically, is your argument based, the problem of the sexual abuse is systemic within the system, and therefore you should be able to develop to what extent it existed throughout? Absolutely. Absolutely, Your Honor. And we have come forward with significant evidence. I mean, this is not the type of motion to dismiss for a fear to state a claim that is based on skinny evidence. We had a voluntary affidavit. We didn't have to go take a deposition from a former officer of the Archdiocese, the Chancellor for Canonical Affairs, Jennifer Hasselberger. That's over 100 pages of affidavit testimony. 800 pages of evidential support. We have 50 paragraphs of material facts that we pled. And yes, much of it does go to control, but some of it does go to financial entanglements when we talk about insurance, when we talk about the inter-parish loan fund, when we talk about the Archdiocese making parishes with more money provide money to parishes with less money. This is a singular unit. That's what we have established, and it's plausible based on the affidavit of Ms. Hasselberger and also the affidavit of Thomas Doyle. So for all those reasons, we think that there is more than a sufficient amount to go forward. Would you concede, counsel, that if the remedy ultimately sought here, as you outlined it this morning, is the equivalent of involuntary bankruptcy under Section 303A, if we were to conclude that case openly, district courts can affirm? Would I concede that? Yeah. Absolutely not. What's left? I'm sorry. I might have misunderstood your question. If the remedy you seek, as described, that is the liquidation of the assets of all of the other entities you wish to bring into the estate, is involuntary bankruptcy as that term is used in Section 303A, then the district court was correct. So you have to win that issue, as I understand it. I agree I have to win that issue, and let me say in respect of that issue, really dangerous territory for this court to affirm that point by the lower courts. The lower courts ignore the language of 303. 303 does not explicitly mandate no substantive consolidation. SAMHSA was in 1941. The Bankruptcy Code was passed in 1978. Congress could have inserted language into the Bankruptcy Code in 1978. It said that no substantive consolidation for entities described in Section 303. It chose not to. Equivalent substantive consolidation is not explicitly mandated by Section 303. And there's a majority of courts out there that have ruled on this very issue, including the Ninth Circuit, just in July. And they confused that rule of substantive consolidation as an independent creditor remedy. You mentioned you wanted to get discovery. But this is one part of a bigger case. Have you not taken extensive depositions and obtained extensive discovery about the financial affairs of the archdiocese and the parishes in the main bankruptcy case? It is one of the biggest frustrations of the committee that we have been denied that opportunity repeatedly. We've been denied the opportunity to hire a financial advisor that would help us develop the evidence we could adduce. And we've been denied the opportunity to bring a more fulsome case before the trial court. And I guess I can leave it there. I see your rebuttal time is working. You may reserve the rest of your time for rebuttal. I would like to do that. Very well. You may do so now. We'll hear from counsel for the appellees. Mr. Anderson, good morning. You may proceed. Good morning. Thank you. May it please the Court, Richard Anderson on behalf of the Archdiocese of St. Paul, Minneapolis, I intend to reserve at least two minutes of the allotted time for a separate argument by counsel for the official parish committee. To back up, there is a substantial question as to whether consolidation is ever available with regard to a non-debtor entity. As pointed out by this Court, Giller dealt with debtor organizations. Certainly, that issue has not been addressed by the Supreme Court or by this Court. However, we don't get to that question, much less the Giller standards or factors, unless this Court determines that the Committee of Unsecured Creditors, the UCC, may do indirectly what it cannot do directly, that is commence an involuntary bankruptcy proceeding against a charitable organization. The language of Section 303A is clear. The Council of Foundations, in its amicus brief, did a good job in providing the history and explaining the purpose of the statute, which goes back many years, predates the Bankruptcy Code of 1978. There's no dispute as to the application of Section 303A in this case. It is not surprising that the UCC has been unable to find a single case, a single case involving the consolidation of a non-profit entity. The basic argument from the UCC is that consolidation is somehow different and distinct from an involuntary bankruptcy proceeding. I mean, isn't one of the issues here how you ask the question? If the question is can a separate entity that's a charitable entity be brought in through consolidation, I think the answer is pretty clearly no under 303A. But if the question is if the separate entity, if what's labeled a separate entity is in fact part of the main entity, that they're all so commingled and so interrelated that they can't be separated, then is the answer the same? The answer is the same because a consolidation order is effectively an involuntary bankruptcy petition. There is no difference, and the UCC has not identified the alleged distinctions and differences between an involuntary petition and a consolidation order. What if the financial affairs are so intertangled that you can't really tell which dollar belongs to which entity? Well, in that case, the committee might, the UCC might have been able to make a case under Giller. They have not made that case. Well, see, now we're talking about a different question. Right. Now you're saying that, well, if it is so intertangled that then maybe Giller would apply. Well, maybe it would, but I think the question assumes something like an alter ego situation, and that has not been alleged or pled here at all. This is not an alter ego case or a piercing the corporate veil case. This is a consolidation case, which is a different creature. Now you have, I'm not sure, there's many APOE briefs, and I'm not sure if it was your brief, but one of the briefs did acknowledge that you could do a fraudulent conveyance trend. Yes. So if the archdiocese or some other nonprofit entity set up a subsidiary corporation, transfer a bunch of assets in, you do acknowledge that that would be a fraudulent conveyance type of cause of action, could be brought under 549, right? Absolutely, and that is a remedy separate and distinct from consolidation, and that was a remedy that was available to the committee in this case, and in fact the UCC sought derivative standing to pursue fraudulent transfer preference claims and other avoidance claims against the same entities that are the target entities in this case. Judge Kressel determined that the committee had not established a basis for derivative standing and had not established a basis for pursuing those claims. That order, I do not believe, was appealed. But yes, the avoidance remedies are available, and I think in your hypothetical, where assets have been transferred back and forth without consideration and so forth, those transfers are certainly a fair game in a bankruptcy proceeding, and that's a remedy far different than a substantial consolidation, a substantive consolidation claim which attempts to bring into a bankruptcy case all of the assets of the target entity. A fraudulent transfer claim would be directed to a specific transfer of a particular pot of assets or money. Here, the committee's, the UCC's, clear intent is to bring all of the assets of all of these entities into the Archdiocese's bankruptcy case. My position is that that is the equivalent of an involuntary bankruptcy proceeding against those entities. In fact, it's worse than an involuntary bankruptcy proceeding because it would make those entities, those target entities, essentially guarantors of the Archdiocese's debt, and probably without the protections of a bankruptcy code proceeding. In other words, the target entities would have all of the burdens of a bankruptcy proceeding. It's not clear to me that they'd have any of the benefits. This was a point that Judge Kressel pushed on at the argument, and I do not believe that he received a satisfactory answer. Judge Loken presented the hypo of the parish that had never had a priest who had committed sexual abuse and had no claims against it. Are there parishes that have claims against them? There are parishes that have claims against them. So how, in this mass, I don't want an exact number, but roughly how many of the, shall we call them subsidiary entities, have claims against them besides the Archdiocese itself? I don't think that's been established in the record. Maybe half, maybe more of parishes. But there are a number of parishes that do not have, have not been implicated in the abuse crisis. So I believe that the primary argument to the Section 303A position is that a consolidation order is different than an involuntary proceeding. I don't think you get there. I think that, if anything, it is a worse result. I don't think that you get around the clear language of 303A by reference to Section 105 because, as the courts below found, Section 105 does not carry with it the ability of a bankruptcy court to take action that the bankruptcy code prohibits. I think that's what is going on here. And for that reason, I don't think it's necessary to get to the broader question of whether you can, under the correct circumstances, consolidate a non-debtor with a debtor entity. And again, the reason for that is? Twofold. One, the non-debtor entity has certain rights under Section 303, including the right to, for example, show that it's paying its debts in the ordinary course of business and it's not subject to an involuntary, should not be subject to involuntary, and that the consolidation is effectively the same as an involuntary bankruptcy proceeding. In fact, it's a de facto merger of the target entity with the debtor entity, and that raises serious due process concerns for the target entities and the creditors and employees, vendors, and so forth of that target entity, all of which are being ignored here. Could our ruling in this case be limited just to a grant of power to proceed with discovery? In other words, are they asking for all or nothing? Well, I believe that the UCC is asking that the court reverse and remand the decisions of Judge Kressel and Judge Montgomery so that they can conduct discovery. So I want to address that. We vigorously dispute the claims of the UCC that they have somehow been deprived of the opportunity to conduct discovery. This case, the procedural posture of this case is driven by decisions made by the UCC. They elected to proceed by motion instead of an adversary proceeding. The UCC filed a regular bankruptcy motion with limited notice within the limited, fairly short time periods permitted under the bankruptcy rules for regular motions. They did not seek discovery in their original motion. On the face of it, the UCC's motion appeared to seek relief as a matter of law based on the affidavits that the UCC had gone out and obtained over some extended period of time without notice to any other parties in this case. Judge Kressel properly applied Rule 9014, the bankruptcy rules, which permits a bankruptcy court to apply the rules of Part 7 of the Bankruptcy Rules on Adversary Proceedings to a contested matter and determine that this case was appropriate for Rule 12 motions to dismiss. The UCC could have proceeded in a much different way. They could have, for example, sought at an early date in the case to conduct a Rule 2004 examination and discovery with respect to their claims of relationships between the parishes and the archdiocese. They elected not to do that. They elected to proceed with these affidavits, which they believe may justify a decision in their favor as a matter of law and at least state a cause of action. I think they're wrong on that point. And so I don't believe that sending this back for additional discovery would accomplish anything other than maybe giving the UCC an opportunity to bolster arguments that are legally insufficient to begin with as determined by Judge Kressel and Judge Montgomery. Again, the threshold problem is Section 303A. If we don't get over that hurdle, there's nothing left to the case. And I don't think you get over that hurdle. Again, I don't think it's necessary to reach the Giller factors for all of those reasons. I think Section 303A covers this case. And if it doesn't, I think this Court should follow what we believe is the majority. The UCC disagrees. But we believe it's the majority position that consolidation of non-debtor corporations with a debtor is not permitted. Giller could and perhaps should be limited to debtor corporations. But I think it's worth saying a word about the first of the Giller factors, which is the factor emphasized by the UCC. This factor deals with the necessity for consolidation due to the interrelationship among the parties. Now, assuming that that factor, that the Giller factors, might apply to a non-debtor case, the first element, I think, comes down to two factors. One, has there been co-mingling or intermingling of assets? And second, what are the reasonable creditor expectations? How do creditors expect to deal with these entities? And the UCC has failed to make a colorable case under either factor. There's no real claim of co-mingling or intermingling in this case. Instead, the UCC has focused on operational, financial, and managerial aspects of the relationship, similar to the claims that were made in the Milwaukee case. The parishes in Milwaukee operate under a statutory scheme very similar to the one in Minnesota. The UCC has relied on those operational, financial, and managerial aspects, and on an argument based on canon law, which raises additional issues as to the court's ability to delve into religious practices to determine internal religious matters. The UCC has cited a number of cases in which consolidation has been ordered, but the UCC has, in our judgment, has not pointed to a single case with facts remotely similar to the facts in this case. Many of the cases the UCC cites, including the bottom case with Ninth Circuit, dealt with Ponzi schemes and instrumentalities used by a debtor to perpetuate a fraud, a Ponzi scheme. That same was true in the Petters case. The Logistics Information Services case cited by the UCC several times dealt with an entity that had no creditors. The case that the UCC provided this court a couple weeks ago in its motion dealt with a limited liability company under the control of an individual and who used his companies to pay, among other things, personal expenses. The UCC has not cited a single case that involved facts anywhere close to what we have in this case. Let me ask you a procedural question. As I understand the current state of the main bankruptcy case, the parties have filed competing plans. There's been a confirmation hearing. Is that correct? Well, Your Honor, Judge Kressel determined that the parties would argue the legal merits of the respective plans, and so that was done at the end of August. The two plans are now before Judge Kressel to determine basically legal objections to the two plans. Assuming he were to confirm one or the other of the two plans, would that essentially moot this issue? Would we have to then go look at the ... I mean, what would that do to this case? If Judge Kressel confirmed our plan, the Archdiocese plan, it might moot this case because it would conclude the entire bankruptcy proceeding, but presumably ... So then they would probably have to appeal that plan, and this would be one of the issues in the appeal of the plan, I presume. I suspect so. I suspect so. But that doesn't ... What happens if he confirms the committee's plan? Well, the committee's plan, I think, effectively does what they are seeking in this case. The committee plan purports to take all of the Archdiocese's assets, put it in a pot, and leave the parishes exposed to claims. But I think ultimately this case is ripe. The claims made by the UCC have obviously created uncertainty and concern with respect to the target entities, and I think resolution of this consolidation issue would help the process. With this, I would yield to my colleague. Very well. Thank you.  Mr. O'Brien? Mr. O'Brien? Thank you, Dennis O'Brien, on behalf of the Parish Committee of Unsecured Creditors. Good morning, Mr. O'Brien. It's the first case I've seen you in as an advocate. Yes. Believe me, it's a very interesting change. The Committee of Creditors for the parish committees were provided for by the bankruptcy court to look after the interests of the parishes here. But I'm here today based on representation of them, along with several other eliminationary entities that have been dragged into this proceeding, namely some schools and some other charitable organizations, because we all have the same interest with respect to this proceeding. It's important to understand and know and acknowledge that none of these are bankruptcy debtors in either this case or any other related case. In fact, these folks, these entities, are all creditors in this bankruptcy case. The extraordinary relief sought by the appellants to collapse and substantively consolidate the assets and liabilities of these eliminationary institutions quite plainly violate the provision of 303A. Beyond that, what essentially the appellant would have the court do is pierce what they claim to be corporate veils behind which the archdiocese is hiding assets. There have been no allegations of facts to show the abuse of any corporate forms, failure to separately maintain books or records, or any of the other incidents that would justify piercing the corporate veil. That's essentially what they're looking for. There's substantial harm here, should this be granted. It may trigger any number of due-on-sale clauses or other insecurity default provisions of mortgages, agreements making payroll for parish staff and teachers and keeping the lights on difficult because they would become enmeshed in a bankruptcy proceeding in which many of their creditors have no connection with this debtor or its debtor-creditor relationships, thousands, perhaps, of additional creditors. This needs to end. This should have ended at the bankruptcy level. It should have ended at the district court level. This needs to end now. This is a lengthy, very costly proceeding that goes nowhere. Thank you. Very well. Thank you for your argument. I'd like to follow up with just a few points in rebuttal. I can say it no better than the debtor itself when it's stated that the parishes must be part of any plan of reorganization, even though they're not debtors. Put simply, the archdiocese cannot receive a fresh start, and the Catholic Church cannot function and maintain its core mission without viable parishes unburdened by litigation. That is what the debtors' plan provides, complete protection to all of the parishes and most of the consolidation parties without contribution. There is a significant policy reason why the lower courts should not be affirmed here. That is, this court would be describing the pathway for the future dishonest debtor to avoid the claims of legitimate creditors. Nowhere in 303A does it say anything about substantive consolidation. Nowhere in 303A does it say anything about piercing the corporate veil or alter ego claims. Had I made either of those claims here, I assure you that my opponents would be up here saying 303A prohibits that. That is why the courts, the lower courts, were unable to say there is an explicit mandate that's being violated. They said in both instances, effectively, an involuntary bankruptcy. This is, in effect, an involuntary. This is not, in effect, a voluntary bankruptcy. This court has it right, and my opponents have it right. An involuntary bankruptcy is about unpaid creditor claims. That's a completely different focus than substantive consolidation. What the archdiocese and its parishes desperately want is for the parishes to have the benefit of the bankruptcy process without the burdens, and the burdens is subjecting their assets to the claims of creditors. Yet they want all the benefits. They're asking for channeling injunctions and third-party releases. Make no mistake. And again, with regard to the relief you claim, do you foresee that some of the parishes that have been swept into this involuntarily will be dropped out as the cases against them fall? It could very well turn that way. The facts and the evidence that I might be able to bring to an evidentiary hearing might determine that only the parishes where folks were abused would remain as part of the case. Back very, very briefly to the argument that had you pledged this differently, you might have gotten some discovery. With all due respect, we filed a motion. The Giller was motioned. These cases are brought on motions. And once a motion is filed and opposed, it becomes a contested matter, and that triggers the rules with respect to discovery. We were not given that. Judge Kressel stayed the discovery immediately and said, I'm going to import Rule 7012. 7012 is not part of what's available in a contested proceeding. But he imported it, as he had the discretion to do, said, I'm going to consider a motion to dismiss immediately. Three weeks after we filed the motion, everyone filed their motions to dismiss our motion. And again, the motion dismissed was based upon the fact that you hadn't adequately established an evidentiary claim, as it were? I think that Judge Kressel described seven different possible avenues on a motion to dismiss for the parties to brief. I guess, finally, I'd just like to- You may have one minute to restate your claim. All right. And I just want to address the credit expectation point. It's so inappropriate, given the context of this case. These creditors are not commercial creditors. These are involuntary creditors. These folks would love nothing better than to not be creditors. And they make no distinction between the parishes and the archdiocese. That's all I have. Thank you. Very well. We thank both sides for the argument. It's obviously been very thoroughly briefed and argued. And the case is now submitted, and we will take it under consideration. Thank you.